**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:22- Civ-24115-XXXX**

WILLIAM JULIAN MUÑOZ FARIETA

        Plaintiff,

   v.

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES

ALEJANDRO MAYORKAS, Secretary U.S.
Department of Homeland Security

UR M. JADDOU, Director U.S. Citizenship
and Immigration Services

JOHN M. ALLEN, Director Texas Service
Center

        Defendants.

_____

## COMPLAINT FOR DECLARATORY RELIEF

    Plaintiff WILLIAM JULIAN MUÑOZ FARIETA ("Plaintiff") hereby sues Defendants,

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, ALEJANDRO

MARYORKAS, UR M. JADDOU, and JOHN M. ALLEN, and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff William Julian Muñoz Farieta a/k/a Julian Farietta a/k/a Julian Farieta a/k/a
   Julian Farrieta is an individual who is at least 18 years of age, who is domiciled in
   Bogota, Colombia and intends to reside in Miami, Florida upon being granted lawful
   admission to the United States as a permanent resident.

2. Defendant United States Citizenship and Immigration Services ("USCIS") is a
   governmental agency with its headquarters in Camp Springs, Maryland.

3. Defendant Alejandro Mayorkas is an individual who is at least 18 years of age, who resides in Washington D.C., and is the Secretary of the U.S. Department of Homeland Security.

4. Defendant Ur M. Jaddou is an individual who is at least 18 years of age, and is the Director of USCIS.

5. Defendant John M. Allen is an individual who is at least 18 years of age, and is the Director of the USCIS Texas Service Center located in Irving, Texas.

6. The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 5 U.S.C. §§701 and 702 *et. seq.*, and 28 U.S.C. § 2201, *et. seq.* Relief is requested pursuant to said statutes. Specifically, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, which provides that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Further, the Declaratory Judgment Act, 28 U.S.C. § 2201, provides that: "[i]n a case of actual controversy within its jurisdiction… any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Review is also warranted and sought under Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, 702 et seq. and § 706(1).

7. Venue properly lies within this district pursuant to 28 U.S.C. § 1391(e) because this is an action against agencies of the United States and its officers in their official capacities, brought in the District where Defendant USCIS has offices, Plaintiff intends to reside, and a substantial part of the events or omissions giving rise to the claim. A substantial part of the events or omissions giving rise to the claim took place in Miami, Florida because Plaintiff's future employment is located in Miami, Florida as indicated in Plaintiff's I-140 immigrant petition for alien worker subject of this lawsuit. The question as to where a substantial part of the events or omissions giving rise to the claim "turns on the general venue statue, 28 U.S.C. § 1391." *Gyau v. Sessions*, Civ. Case No. 18-407, 2018 WL 4964502, at *1 (D.D.C. Oct. 15, 2018). Then, the court determines whether the

proposed transfer is "in the interest of justice, " 28 U.S.C. § 1404(a), by "'balanc[ing] a number of case-specific factors[]' related to both the public and private interests at stake." *Douglas v. Chariots for Hire*, 918 F.Supp.2d 24, 31 (D.D.C. 2013) (quoting *Stewart Org.*, 487 U.S. at 29). Here, much fact-finding and discovery would be in connection with the future employer because Mr. Munoz has a standing employment offer in Miami, Florida and one of the requisites for an EB-1 visa on the grounds of extraordinary ability is evidence showing that he or she will continue working in his or her area of expertise.

## EXHAUSTION OF REMEDIES

8. Plaintiff has exhausted his administrative remedies. The denial of the I-140 Petition subject of this lawsuit is a final agency action. There is no statutory or regulatory requirement to appeal to the agency. *See Darby v. Cisneros*, 509 U.S. 137, 146-47 (1993); *RCM Techs. V. 18 DHS*, 614 F.Supp.2d 39, 45 (D.D.C. 2009).

## GENERAL ALLEGATIONS

9. This action is brought against the Defendants for declaratory judgment and review of an agency action under the Administrative Procedure Act based on the Defendants' unlawful, arbitrary, and ultra vires denial of the I-140 Immigrant Petition for Alien Worker filed by Plaintiff to classify himself as an alien of extraordinary ability as a Spanish-language Actor.

10. Plaintiff filed an I-140 petition with U.S. Citizenship and Immigration Services ("USCIS") seeking an immigrant visa under the employment-based first preference category ("EB-1") of the Immigration and Nationality Act ("INA") on March 30, 2021.

11. The INA provides for immigrant visas to be made available each year to a certain number of foreign workers who fall within the employment based-first preference category, including noncitizens with extraordinary abilities in the arts, to obtain lawful permanent residence in the United States. 8 U.S.C. § 1153(b)(1)(A).

12. A noncitizen seeking an EB-1 visa on the grounds of "extraordinary ability" must submit evidence showing that he or she will be continuing to work in the area of his or her expertise. 8 C.F.R. § 204.5(h)(3). Additionally, the noncitizen must prove extraordinary ability in their field of endeavor in one of two ways. The first way is demonstrating a "one-time achievement (that is, a major, international recognized award)" *Id*. The second way to prove extraordinary ability is by providing evidence of at least three of the following:

> (i) Documentation of the alien's receipt of lesser nationally or internationally recognized prizes or awards for excellence in the field of endeavor;
>
> (ii) Documentation of the alien's membership in associations in the field for which classification is sought, which require outstanding achievements of their members, as judged by recognized national or international experts in their disciplines or fields;
>
> (iii) Published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field for which classification is sought. Such evidence shall include the title, date, and author of the material, and any necessary translation;
>
> (iv) Evidence of the alien's participation, either individually or on a panel, as a judge of the work of others in the same or an allied field of specification for which classification is sought;
>
> (v) Evidence of the alien's original scientific, scholarly, artistic, athletic, or business-related contributions of major significance in the field;
>
> (vi) Evidence of the alien's authorship of scholarly articles in the field, in professional or major trade publications or other major media;
>
> (vii) Evidence of the display of the alien's work in the field at artistic exhibitions or showcases;
>
> (viii) Evidence that the alien has performed in a leading or critical role for organizations or establishments that have a distinguished reputation;
>
> (ix) Evidence that the alien has commanded a high salary or other significantly high remuneration for services, in relation to others in the field; or
>
> (x) Evidence of commercial successes in the performing arts, as shown by box office receipts or record, cassette, compact disk, or video sales.

*Id. See also* 6 USCIS Policy Manual, pt. F, ch. 2 § B(2). If a petitioner has submitted the requisite evidence, USCIS determines whether the evidence demonstrates both a "level of expertise indicating that the individual is one of that small percentage who have risen to the very top of the[ir] field of endeavor," 8 C.F.R. § 204.5(h)(2), and "that the alien has sustained national or international acclaim and that his or her achievements have been recognized in the field of expertise." 8 C.F.R. § 204.5(h)(3). Only aliens whose achievements have garnered "sustained national or international acclaim" are eligible for an "extraordinary ability" visa. 8 U.S.C. § 1153(b)(1)(A)(i).

13. The current standard of review for determining EB-1-1 Extraordinary Ability is set out in *Kazarian v. USCIS* 596 F.3d 1115 (9th Cir. 2010), holding that a petitioner claiming extraordinary ability need not submit extraordinary evidence to prove that he or she is a person of extraordinary ability. *Kazarian* holds a two-step analysis of the evidence. In the first part of the test, the USCIS has to determine whether the individual has met three (3) of the ten (10) criteria to establish extraordinary ability. Even after meeting the first part of the test, the individual has to establish by a "final merits determination" that he or she is extraordinary. *Kazarian* did not provide a definition of the final merits determination.

14. The U.S. Citizenship and Immigration Service (USCIS), on December 22, 2010, published the Policy Memorandum (PM-602-0005.1) titled "Evaluation of Evidence Submitted with Certain Form I-140 Petitions; Revisions to the Adjudicator's Field Manual (AFM) Chapter 22.2, AFM Update AD11-14", providing guidelines regarding the analysis that USCIS officers who adjudicate these petitions should use when evaluating evidence submitted in support of Form I-140, Immigrant Petition for Alien Worker and the "two-part adjudicative approach" for extraordinary ability.

15. *Muni v. INS*, 891 F. Supp. 440, 445 (N.D. Ill. 1995) stated that by satisfying three (3) criteria and by meeting the plain language of the regulations, an alien is deemed to have sustained acclaim and, therefore, is deemed extraordinary. Additionally, in *Buletini v. INS*, 860 F. Supp. 1222, 1229 (E.D. Mich. 1994) the court held that once it is established that the alien's evidence is sufficient to meet three (3) criteria listed in

203(b)(1)(A) the alien must be deemed to have extraordinary ability unless the USCIS sets forth specific and substantial reasons for its findings that the alien, despite having satisfied the criteria, does not meet the extraordinary ability standard.

16. In his initial petition, Mr. Munoz submitted evidence that satisfied three of these ten criteria. In accordance with *Buletini v. INS Court* and *Muni v. INS*, once it is established that the alien's evidence is sufficient to meet three criteria listed in the regulation, the alien must be deemed to have sustained acclaim and deemed extraordinary. There is no requirement in the law or in the plain meaning of the statute that evidence submitted in each criterion be "sustained or maintained." Rather, as stated by the courts in *Muni* and Buletini, satisfaction of three (3) evidentiary criteria is de facto proof of sustained international or national acclaim. Any other interpretation is contrary to law and the statute and, therefore, impermissible.

17. The three criteria initially presented by Mr. Munoz were *(i)* published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field for which classification is sought; *(ii)* evidence of the display of the beneficiary's work in the field at artistic exhibitions or showcases; and *(iii)* evidence that the beneficiary has performed in a leading or critical role for organizations or establishments that have a distinguished reputation.

18. However, on July 25, 2022, the Texas Service Center issued a Request for Evidence ("RFE"), informing Mr. Munoz that it did not consider any of the criteria met and asking for additional evidence to support the criteria he had argued were satisfied. The requirement of evidence showing that Mr. Munoz would be continuing to work in the area of his or her expertise was never questioned.

19. USCIS policy allows petitioners to submit evidence for criteria not originally argued as met in the initial filing as long as the evidence shows the beneficiary was eligible for the requested benefit when the Form I-140 was originally filed.

20. Mr. Munoz timely complied with the request for additional evidence and on September 20, 2022 presented evidence supporting four additional criteria he met, totaling seven out

of the ten criteria. Nonetheless, on September 28, 2022 USCIS issued a decision denying his visa petition on the grounds that he had not satisfied any of the seven presented criteria of eligibility.

21. Specifically, in the same order as discussed in the denial, the seven criteria for which Mr. Munoz presented evidence in the response to the RFE were: *(i)* published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field for which classification is sought.; *(ii)*  evidence of the display of the alien's work in the field at artistic exhibitions or showcases*; (iii)* evidence that the beneficiary has performed in a leading or critical role for organizations or establishments that have a distinguished reputation; *(iv)* documentation of the alien's membership in associations in the field for which classification is sought; *(v)* evidence of the alien's participation, either individually or on a panel, as a judge of the work of others in the same or an allied field of specification for which classification is sought; *(vi)* evidence that the beneficiary has commanded a high salary or other significantly high remuneration for services, in relation to others in the field; and *(vii)* evidence of commercial successes in the performing arts, as shown by box office receipts or record, cassette, compact disk, or video sales.

22. The July 25, 2022 request for additional evidence issued by USCIS was vague and facially arbitrary and capricious, providing little if any guidance on what exactly the USCIS Officer's doubts were or what additional evidence the Officer wanted to see. For instance, for the first criteria titled "published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field for which classification is sought", besides the boilerplate template language USCIS provides officers for requests for evidence, the Officer only stated "[t]his criterion has not been met because the evidence submitted does not demonstrate that the published material was published in professional or major trade publications or other major media."

23. Based on the statutory requisites for the "published material about the beneficiary…" criterion, the Officer granted three out of the four parts of the criterion. Thus, this

criterion should have been granted if Mr. Munoz demonstrated in his response to the request for evidence that the published material was published in professional or major trade publications or other major media. Mr. Munoz's published material presented in support of this criterion was published in a newspaper named "Q'Hubo" and an entertainment magazine named "TvyNovelas".

24. The plain language of the statute allows for this criterion to be granted if the published material is published in any of these three types of publications: professional trade publications, major trade publications, or other major media. Mr. Munoz explained in his response to the RFE that both Q'Hubo and TvyNovelas are "other major media" and provided several objective and independently verifiable documents in support. Specifically, Mr. Munoz provided a media kit in the initial filing and in his response to the RFE showing that Q'Hubo had 1,800,000 daily newspaper readers, a national audience of 1,658,815, and a total circulation of 387,000 nationwide in Colombia. Additionally, in the RFE response Mr. Munoz provided a statistical analysis by www.mobimetrics.co placing Q'Hubo as the third-most-read newspaper by Colombians holding a 36.5% share nationwide. Similarly, Mr. Munoz provided an article by www.revistapym.com.co recognizing Q'Hubo as "the most read newspaper in Colombia" in 2018. That article also attested to the intended audience of the Q'Hubo newspaper, which are readers interested in general topics including entertainment.

25. In the RFE response Mr. Munoz also explained that besides being "other major media", TvyNovelas can also be considered "professional or major trade publications" because he is an actor and the magazine is "the leading magazine in the field of show business and the entertainment industry." Before its closure, the magazine was "one of the most widely read magazines in the South American country" [Colombia] per an independent and objective publication by www.eleconomista.com.mx describing TvyNovelas as major media. Furthermore, during the time it was open, TvyNovelas was one of the most successful magazines in Colombia and Latin America as the record thoroughly shows. In

fact, TvyNovelas even surpassed National Geographic in readership figures in Colombia at one point.

26. Despite providing seven separate documents including statistic reports, governmental reports, and independent articles about Q'Hubo and TvyNovelas being "other major media", in the denial the Officer stated that Mr. Munoz did not meet this criterion. The Officer's explanation was that "[t]he petitioner did not submit material to establish the circulation statistics for publishing sources, nor did the petitioner provide other circulation data to compare with those of these publications. The documents submitted regarding circulation statistics appear to be power point presentations, and not from an official site. Without additional corroboration the petitioner has not illustrated that the article was published in major media."

27. The Officer's reasoning for determining that Mr. Munoz did not satisfy this criterion is contradictory, untrue, and generally capricious. Specifically, the Officer first states that the petitioner did not submit material to establish the circulation statistics for publishing sources at all, but then contradictorily and incorrectly states that the documents submitted regarding circulation statistics appear to be PowerPoint presentations. Mr. Munoz did submit material to establish the circulation statistics for both Q'Hubo and TvyNovelas. For Q'Hubo, Mr. Munoz provided the newspaper's media kit detailing its circulation figures. For TvyNovelas, Mr. Munoz provided the magazine's circulation statistics as reported by a media catalogue published by a governmental body from Mexico – the Electoral Institute of the State of Mexico. As far as the software used to create these reports, it is irrelevant as neither the regulations nor the statute require or forbid for media circulation statistics to be created in PowerPoint, or any specific software for that matter. Besides, even if the circulation statistics were created in PowerPoint, the legitimacy of those statistics is evidenced by the various independent and objective sites that published said statistics such as www.mobimetrics.co, www.revistapym.com.co, and www.eleconomista.com.mx. Furthermore, the denial's arbitrary nature is evidenced by the Officer's statement that "…the petitioner has not illustrated that the article was

published in major media." It is unclear which article the Officer is basing his denial on as Mr. Munoz provided six different articles from three separate sources in support of this criterion. This further casts significant doubt on whether the Officer evaluated all of the evidence provided in support of this criterion.

28. Conclusive and unfounded statements are arbitrary, capricious, and an abuse of discretion, which is contrary to the law pursuant to 5 U.S.C. § 706(2)(A). The Officer in effect added their own law by adding requisites beyond the statutory language, case law, and policy memoranda affirming that documents created on PowerPoint software are insufficient to satisfy the "published material" criterion.

29. The second criteria which the Officer questioned in the RFE and later stated Mr. Munoz did not meet in the denial is the "evidence of the display of the beneficiary's work in the field at artistic exhibitions or showcases." Mr. Munoz's field of work is acting. Thus, his work is exhibited on theater stages and on television screens. In the initial I-140 filing, Mr. Munoz provided approximately ten photographs of him acting in different televised soap operas and theater productions. In the initial filing Mr. Munoz also explained that the television programs and plays qualified as "artistic showcases" within the plain meaning of the statute because they were mediums for exhibiting Mr. Munoz's work before the public in an attractive and favorable aspect to attract viewership and attendance. Furthermore, in support of this criterion Mr. Munoz's support letter in the initial filing referenced various major media publications about the television series to show that his work as an actor was actually showcased and that the showcases were artistic in nature.

30. In the RFE, besides the boilerplate template language for RFEs, the Officer only states that the second criterion was not met "because the evidence does not indicate that the petitioner's work product was displayed at artistic exhibitions or showcases (virtual or otherwise). The petitioner only submitted photos." This rebuttal is vague because the only reasoning the Officer uses to support his refusal to grant Mr. Munoz this criterion is that the evidence submitted in support of this criterion are photographs. The Officer does not

explain why the photographs provided were insufficient to meet this criterion. In the RFE the Officer also failed to consider the major media publications about the television series although Mr. Munoz explicitly stated in his support letter that he was also using that evidence in support of this criterion.

31. In Mr. Munoz's RFE Response Mr. Munoz provided additional documentation to establish that his work product was displayed at artistic exhibitions or showcases. Specifically, he presented "materials created to promote and publicize the artistic exhibitions or showcases" as explicitly allowed and suggested by the Request for Evidence. For instance, Mr. Munoz provided an array of flyers created for the purpose of promoting his artistic work in the theater production he was acting in. These flyers were clearly created for the purpose of promoting Mr. Munoz's artistic work because they include his name, photograph and announce the date, time, location, and ticket sales for the theater production. Likewise, Mr. Munoz referenced published articles that also had the purpose of promoting Mr. Munoz's artistic work because they also included his name and photograph and gave publicity to the theater production by announcing show dates and location. Additionally, Mr. Munoz provided evidence in support that his work was also displayed at artistic exhibitions or showcases when he performed on international television screens in La Viuda Negra II. Specifically, Mr. Munoz submitted digital flyers posted on Unimas television channel's Instagram where he was clearly pictured acting. Mr. Munoz explained in his RFE response that these Instagram posts were created for the purpose of promoting Mr. Munoz's artistic work because they were posted in anticipation of newly released episodes. Furthermore, Mr. Munoz explained that his work was also displayed at artistic exhibitions or showcases when he performed on international television screens in El Bronx. In support of this argument, Mr. Munoz submitted the production's promotional art and explained that this poster was created for the purpose of promoting Mr. Munoz's artistic work because they were used as the official artwork for the production for all advertising matters (print, television, and digital.)

32. Despite all of the additional evidence submitted in support of the second criterion, in the denial the Officer states "[i]n response to the RFE the petitioner did not submit additional evidence." Besides this and the boilerplate RFE template language, the Officer only supports the denial of this criterion stating once again "[t]he petitioner only submitted photos." Conclusive and unfounded statements are arbitrary, capricious, and an abuse of discretion, which is contrary to the law. By ignoring the additional evidence submitted in support of this second criterion in the RFE response, the Officer acted arbitrarily, capriciously, and abused their discretion.

33. The third criterion which the Officer questioned in the RFE and later stated Mr. Munoz did not meet in the denial is "evidence that the beneficiary has performed in a leading or critical role for organizations or establishments that have a distinguished reputation."

34. In support of the third criterion in the initial filing Mr. Munoz submitted evidence of his leading roles in three television productions, one theater production, and one music video. Specifically, Mr. Munoz provided a total of sixteen articles published in major media. All these articles either discussed the productions' success, Mr. Munoz's leading role in the productions, or both.

35. In the RFE, besides the general boilerplate language provided by USCIS for RFE templates, the Officer only provides circular reasoning for not granting Mr. Munoz this criterion. Specifically, the Officer states "[t]his criterion has not been met because the evidence does not indicate that the role the petitioner has performed for the organizations or establishments was leading or critical. Also the evidence does not demonstrate that the organizations or establishments for which the petitioner has performed in leading or critical roles have a distinguished reputation." In short, the Officer did not provide any reasoning or argument for not granting Mr. Munoz this criterion besides simply stating that Mr. Munoz did not satisfy either parts of this prong.

36. In the RFE response, Mr. Munoz explained in details how the evidence initially submitted satisfied the third criterion and also provided new evidence suggested by the RFE, not submitted in the initial filing.

37. Specifically, in support of the third criterion Mr. Munoz submitted approximately twenty seven documents in the form of employment contracts, testimonials, and major media publications discussing the productions' success, Mr. Munoz's leading role in the productions, or both. The distinguished television and theater establishments where Mr. Munoz had a leading or critical role are now presented in the same order as Mr. Munoz argued in his RFE Response. Mr. Munoz performed a leading and critical role in the "Me Enamoré" theater establishment because he was the co-protagonist. In support of this contention, Mr. Munoz provided a testimonial by the production's producer, his employment contract, promotional material picturing and naming Mr. Munoz as one of the protagonists, and an array of major media articles explicitly identifying Mr. Munoz as the co-protagonist of the theater establishment. For example, the article by www.pulzo.com is completely about Carlos Giraldo and Mr. Munoz and it describes them as "the protagonists of the play 'Me enamoré' [I fell in love]." Similarly, the www.rcnradio.com article states that the play is "starring Carlos Giraldo and Julian Farrieta." Furthermore, the testimonial clearly describes Mr. Munoz as one of the "protagonists" of the play. The protagonist of a play is a leading role in a theater production because they are the individuals that audiences purchase tickets to watch act and they are the face of the production. This Spanish-language theater establishment has distinguished reputation because it is marked by excellence and prominence as it received major media recognitions by publications such as www.rcnradio.co, www.kienyke.com, and www.publimetro.co. For example, the www.rcnradio.com article gives the Me enamoré theater establishment publicity by announcing the days, times, and location where the production is held. Additionally, as stated by the publications, the play starred Mr. Munoz and Carlos Giraldo, one of Colombia's most prominent public figures in the field of entertainment. Furthermore, the play's writer is Daniel Galeano, a renowned playwright in Colombia with over 16 years of experience in theater.

38. In further support of the third criterion Mr. Munoz then argued his leading and critical role in the distinguished television establishment, *El Cartel de los Sapos: El Origen*. Mr. Munoz explained that although this evidence was newly presented, he was eligible for this criterion when he filed his Form I-140 because as evidenced by his employment contract, he began working in this production in August 2020, before filing his Form I-140 application. Mr. Munoz performed a leading and critical role in this production because he was one of the protagonists of *El Cartel de los Sapos: El Origen*. Mr. Munoz provided a testimonial by the production's Executive Director, Mr. Asier Aguilar. The testimonial contained detailed and probative information that specifically addressed how Mr. Munoz's role for the establishment was leading and critical. The testimonial also detailed the specific tasks and accomplishments Mr. Munoz performed for the establishment stating among other things,

> Mr. Muñoz's role is leading and critical because he is one of the protagonists of the production. The roles played by protagonists are critical in the series because they are the characters on which the story focuses. In addition, it is the most important and fundamental role of a series, telenovela or movie.
>
> In his starring role the plot and story line of the series focus on the character of Mr. Muñoz as he is the driving force of the highlights of the series. In short, EL CARTEL DE LOS SAPOS EL ORIGEN would not have come to fruition without Mr. MUÑOZ's interpretation of his character. Mr. MUÑOZ's primary duties were to bring his character to life on camera, read scripts, take directional cues, and attend rehearsals. Mr. MUÑOZ was also responsible for giving live and recorded interviews as part of the series' post-production advertising strategy.

Mr. Munoz's leading and critical role in this establishment was further evidenced by major media publications like www.diario24.ar and www.nacion.com identifying Mr. Munoz as one of the main cast members. These articles explicitly name Mr. Munoz in his starring role. Mr. Munoz explained in the RFE Response that *El Cartel de los Sapos: El Origen* is a television establishment with distinguished reputation marked by excellence and eminence due to its international commercial success and popularity. Specifically, as detailed in the testimonial by Mr. Aguilar, CARACOL TV is a leading television channel

of distinguished reputation in Colombia analogous to CNN or Fox in the United States. *El Cartel de los Sapos: El Origen* was produced by Caracol TV for Netflix worldwide. In addition, the series features a world-renowned cast and production team. For example, one of Mr. Munoz's co-stars in *El Cartel de los Sapos: El Origen* is Mr. Gustavo Angarita Jr, an exceptional Spanish-speaking actor who has starred in important television channels such as Telemundo, and platforms such as Netflix among others. Other objective evidence Mr. Munoz provided in his RFE Response that demonstrates *El Cartel de los Sapos: El Origen*'s eminence, distinction, and excellence are the major media publications by www.nacion.com, www.elnacional.com, www.vanguardia.com, and www.elespectador.com attesting to the television establishment's commercial success. For instance, the independent and objective publication by www.nacion.com states the production ranked among the top 10 most watched productions in Costa Rica on Netflix. Similarly, the independent and objective publication by www.elnacional.com states the production ranked among the top 10 most watched productions in Venezuela on Netflix. Finally, the independent and objective publication by www.vanguardia.com states the production ranked among the top 10 most watched productions in Colombia on television.

39. The following television establishment Mr. Munoz offered in support of meeting the third criteria was *La Viuda Negra* season one and two. Mr. Munoz specified in his RFE Response that he performed a leading and critical role in season one and season two of this television establishment because he played the role of "Michael Corleone," the son of the protagonist. In support of this contention, Mr. Munoz provided a testimonial from the establishment's Executive Producer, Mr. Hugo Leon Ferrer. In his testimonial, Mr. Leon thoroughly details Mr. Munoz's achievements and tasks in the establishment. Specifically, the testimonial states,

> Julian Farietta had a critical and leading role in productions such as LOS VICTORINOS AND LA VIUDA NEGRA because without the central characters that he played in all these productions, the productions would not have had the success they had nationally and internationally, since in these he fulfills protagonist roles and

these are the most important within a series, soap opera or movie. On the other hand, I want to emphasize that thanks to the dedication, experience and extraordinary skills, Mr. Julián Farietta contributed so that these productions were nominated for the most important awards at the national level such as: India Catalina Awards, TV y Novela Awards and Produ Awards. Undoubtedly, the participation of Julian Farietta within each of these television establishments were highly important for these establishments. Without Julián Farietta, it would have been literally impossible to have made these television establishments since as part of the main cast, Julián Farietta was part of all the most important and key scenes of all these productions.

Additionally, in season 2, the entire plot of the season was centered around saving Mr. Munoz's character's life. In support of this contention, Mr. Munoz submitted a major media publication by www.elespectador.com where he was explicitly identified as the actor playing "Michael Corleone Blanco." Specifically, the article states "Julián Farieta is Michael Corleone Blanco: the son of Griselda Blanco. A young man of approximately 22 years old and who is in prison sentenced to die in the electric chair, one of the reasons why his mother decides to protect him by agreeing to collaborate with the United States government." Furthermore, Mr. Munoz submitted two major media publications by www.laopinion.com.co which also identify him as one of the principal cast members. This Spanish-language entertainment establishment has distinguished reputation as it is marked by distinction because it received major media recognitions by publications such as www.elespectador.com and www.laopinion.com.co. Additionally, as stated by the www.produ.com publication, the first season of this television establishment "captured an audience of more than 5.8 million viewers during the simultaneous premiere of the first season, placing Univision in second place at that time and surpassing ABC and CBS." The fact that the second season premiered on Univision and Galavision also demonstrates its distinguished reputation because those are some of the most renowned Spanish-language television channels worldwide. Similarly, Mr. Munoz presented evidence showing that La Viuda Negra II ranked number 18 among the top twenty US Hispanic productions on primetime from February 29 to March 6, 2016.

40. The final television establishment Mr. Munoz offered in support of meeting the third criteria was *El Bronx*. In the RFE Response Mr. Munoz explained that he performed a leading and critical role in this television establishment because he played the role of "Chico," one of the main antagonists. As evidentiary support, Mr. Munoz submitted a testimonial by the establishment's director, Mr. Osorio, detailing the importance of Mr. Munoz's role in the establishment stating in part:

> I attest that Mr. Julian Farietta played the character of "CHICO" in this series, being one of the main antagonists of the series. It is noteworthy that as an antagonist, Mr. Julian played an extremely important role in the productions, and thanks to the role played by Mr. Julián Farietta, the plot of the story of our series was unleashed.

Additionally, Mr. Munoz submitted an article by www.bluradio.com stating "Julian Muñoz Farieta is 'Chico' one of the antagonists of the production 'El Bronx' [The Bronx.]" Mr. Munoz was interviewed extensively about his role in the television establishment and a summary of the interview was published in that article. Mr. Munoz's role as antagonist in *El Bronx* was also leading because his scenes earned recognition by major media. For example, Mr. Munoz provided USCIS with an article by www.publimetro.co completely about one of Mr. Munoz's scenes. Furthermore, Mr. Munoz submitted an article introducing Mr. Munoz and his character which was published by   www.caracoltv.com, the official website of the channel where the production aired. Mr. Munoz is clearly pictured in the article and identified as "Julian Farieta" in the article titled "They are the actors who play the fearsome 'Nina' and 'Chico' in 'El Bronx' [The Bronx]." Moreover, *El Bronx* has distinguished reputation as it is marked by distinction because it has received major media recognitions by publications such as www.bluradio.com, www.publimetro.co, and www.caracoltv.com. As stated by the www.bluradio.com publication on the record, the show was broadcasted by Caracol Television, one of Colombia's most important national channels analogous to CNN or

Fox in the United States. To have a production broadcasted by a channel of such significant reach establishes *El Bronx*'s distinguished reputation because only the most prominent productions are bought and broadcasted by national channels of such high echelon. Mr. Munoz also submitted several articles giving publicity to the television establishment by announcing its premiere and special episodes which were published on www.caracoltv.com, the official website of the channel where the production aired. Further, Mr. Munoz explained in his RFE Response that the establishment's distinguished reputation is evidenced by its commercial success because according to an article on the record by www.colombia.com, *El Bronx* finale achieved the number one spot in ratings in Colombia. Similarly, Mr. Munoz provided an article by www.pulzo.com stating *El Bronx* ranked number two in television ratings in Colombia the day it premiered.

41. Despite the additional fifteen documents Mr. Munoz submitted in support of the third criterion in the RFE Response, in the denial the USCIS Officer incorrectly stated "[i]n response to the RFE the petitioner did not submit additional evidence."

42. Conclusive and unfounded statements are arbitrary, capricious, and an abuse of discretion, which is contrary to the law. By completely disregarding the additional evidence submitted in support of the third criterion in the RFE response, the Officer acted arbitrarily, capriciously, and abused their discretion.

43. In the denial, the Officer's only reasoning for not granting the third' criterion's requisite that the beneficiary's role in the establishments was leading or critical was circular. The Officer only stated "[t]he evidence does not indicate that the role the petitioner has performed for the organizations or establishments was leading or critical."

44. Conclusive and unfounded statements are arbitrary, capricious, and an abuse of discretion, which is contrary to the law. The Officer acted arbitrarily, capriciously, and abused their discretion by completely disregarding the additional evidence submitted in support of the third criterion's requisite that the beneficiary's role in the establishments was leading or critical.

45. Besides the statements in paragraph 41 and 43 and the boilerplate RFE template language, the Officer only supports the denial of this criterion stating, "the evidence only provides general information and does not contain information about any awards, recognition, or achievement garnered by the organization or establishment, or otherwise demonstrate that the organization or establishment has a distinguished reputation." This statement is also arbitrary, capricious, and an abuse of discretion because as detailed in paragraphs 37 to 40, several independent and objective evidentiary documents were submitted showing that the theater and television establishments earned awards, recognition, and achievement demonstrating their distinguished reputation.

46. Conclusive and unfounded statements are arbitrary, capricious, and an abuse of discretion, which is contrary to the law. The Officer acted arbitrarily, capriciously, and abused their discretion by completely disregarding the additional evidence submitted in support of the third criterion's requisite for the establishments or organizations to have a distinguished reputation.

47. The fourth criterion which the Officer stated Mr. Munoz did not meet in the denial is "documentation of the beneficiary's membership in associations in the field for which classification is sought…"

48. To satisfy the fourth criterion, the evidence must satisfy four requisites: (i) that the beneficiary is member of an association, (ii) that the associations are in the beneficiary's field, (3) that the associations require outstanding achievements of their members, and (4) that membership eligibility is judged by recognized national or international experts in their field.

49. Mr. Munoz presented evidence of his membership in "Actores Sociedad Colombiana de Gestion" [Actors Colombian Management Association] in his RFE Response. Based on the denial, the Officer did not grant Mr. Munoz this criterion because the third requisite – that the associations require outstanding achievements of their members – was not satisfied.

50. The Officer's reasoning for not granting Mr. Munoz the fourth criterion was

The petitioner did not submit the bylaws for the association. Also, the fact that the letter used USCIS language pertaining to this criterion is not sufficient, because the petitioner did not submit documentary evidence in support of the statements on the letter.

Evidence must demonstrate that the association requires outstanding achievement as an essential condition for admission to membership. Requirements that only include employment or activity in a given field; minimum education, experience, or achievement; recommendations by colleagues or current members; or payment of dues do not satisfy this criterion since these requirements do not constitute outstanding achievements.

51. Neither the regulations nor the plain language of the statute require for association bylaws to be submitted to meet the fourth criterion.

52. The only public USCIS document mentioning association bylaws in connection with the fourth criterion is the Request for Evidence Template for I-140 E1-1 Alien of Extraordinary Ability in the outreach engagements section of the USCIS website. Said document merely lists the association's constitutions or bylaws as an example of documents the petitioner *may* submit to assist in determining that the associations require outstanding achievements of its members (emphasis added). The RFE template does not state or even imply that the association's constitutions or bylaws are an indispensable document that must be submitted to be granted the fourth criterion.

53. Requiring a specific document to be submitted despite the fact that the statute does not require said document is arbitrary, capricious, and an abuse of discretion. The Officer in effect created their own law by adding requisites beyond the statutory language, case law, and policy memoranda by turning an optional document into a required one.

54. Mr. Munoz submitted a testimonial from the association's general secretary in support of the fourth criterion's requisite of showing that the associations require outstanding achievements of their members. Said testimonial disclosed the achievements new association members must fulfill to obtain membership. Specifically, the testimonial states new members must have achieved "[h]ave been part of 2 or more main casts of an audiovisual work broadcast on national and international channels. Have been nominated

in one of the awards that highlight the best of acting talent in our country. Be part of the best paid players in the national industry."

55. The Officer's decision to decline accepting this testimonial as sufficient evidence that the association requires outstanding achievements of their members because "documentary evidence in support of the statements on the letter" was not submitted is arbitrary, capricious, and an abuse of discretion. The regulations do not require supporting evidence to be submitted in support of every statement on a testimonial. Additionally, supporting evidence was submitted in support of the statements on the letter. Specifically, publications by www.nacion.com and www.miredvista.co were submitted in support of the statements in the testimonial that the individuals who evaluated Mr. Munoz's achievements before granting his membership are national experts in the field of acting. Additionally, Mr. Munoz submitted an article by www.latinartis.org about the association in support of the testimonial's statement that the association is related to the field of acting.

56. The fifth criterion which the Officer stated Mr. Munoz did not meet in the denial is "evidence of the beneficiary's participation, either individually or on a panel, as a judge of the work of others in the same or an allied field of specialization for which classification is sought."

57. The fifth criterion requires evidence (1) of the beneficiary's participation, either individually or on a panel as a judge, and (2) that the beneficiary judge the work of others in the same or an allied field.

58. The Officer's reason for declining to grant Mr. Munoz the fifth criterion was "[t]here is no evidence to establish that the petitioner actually participated in the judging of the work of others. A letter without supporting documentation is not sufficient to meet this requirement. Also, the letter was dated 2022, but the claimed event took place in 2019."

59. The Officer's decision to decline accepting this testimonial as sufficient evidence that Mr. Munoz actually judged the work of others because additional supporting documentation was not submitted is arbitrary, capricious, and an abuse of discretion. The

regulations do not state that a letter is insufficient evidence to show a beneficiary's participation as a judge of the work of others. The Officer in effect created their own law going beyond the statutory language, case law, and policy memoranda by arbitrarily deciding that a singular document was insufficient to prove part of this criterion.

60. Additionally, the Officer implicitly casts doubt on the authenticity of the letter's content because it was written in 2022 although the event Mr. Munoz judged occurred in 2019. This is arbitrary, capricious, and an abuse of discretion because the standard of proof in EB-11 petitions is the "preponderance of the evidence" standard. *Matter of Chawathe*, 25 I&N Dec. 369 (AAO 2010). According *to Matter of E-M-*, 20 I & N Dec. 77, 79-80 (Comm. 1989), if the applicant demonstrates by a preponderance of the evidence that the claim is probably true then the applicant has satisfied the standard of proof — even if the director has some doubt as the truth. *Matter of E-M-* defines "preponderance" as showing that "the matter asserted is more likely than not to be true." *See also U.S. v. Cardozo-Fonseca*, 480 U.S. 421 (1987) (defining "more likely than not" as a greater than 50 percent probability of something occurring). See 101 INA (a)(44)(A)(ii); 8 C.F.R. § 204.5 (j)(5). (Filings are not required to demonstrate eligibility beyond a reasonable doubt).

61. It is not unusual for institutions to provide certificates confirming an individual's participation in an event at a later date if requested by the participant. In Mr. Munoz's case, he requested a letter confirming his participation as judge in 2022 for purposes of providing evidentiary support for his EB-11 petition because he never had another reason to prove said participation.

62. The sixth criterion which the Officer stated Mr. Munoz did not meet in the denial is "[e]vidence that the beneficiary has commanded a high salary or other significantly high remuneration for services, in relation to others in the field."

63. The sixth criterion requires evidence (1) of the beneficiary's salary or remunerations in the field, and (2) that the beneficiary's salary or remuneration is significantly high relative to others working in the field.

64. The Officer's reason for declining to grant Mr. Munoz the sixth criterion was the second part of the requisite, reasoning that "[t]he income tax and salary information for actors do not show the petitioner is earning higher income that his peers. The salary information provided shows actors earn between 1,145,555 and 6,732,493, which is the same or higher that the amount listed on the petitioner taxes for work income."

65. The Officer's reasoning stated in paragraph 64 is arbitrary, capricious, and an abuse of discretion because it is grossly incorrect. Mr. Munoz's tax declaration on the record show that he earned a total net income of 169,290,000 Colombian Pesos ("COP") in 2020. When divided into twelve equal parts, Mr. Munoz's total net annual income for 2020 equals 14,107,500 COP per month. Furthermore, Mr. Munoz provided a copy of his employment contract showing that in 2020 he earned 23,000,000 COP monthly from August to December 2020 through his employment contract as an actor with Caracol television channel in *El Cartel de los Sapos: El Origen*.

66. The 23,000,000 COP Mr. Munoz earned per month just in *El Cartel de los Sapos: El Origen* is a higher sum than 1,145,555 COP and 6,732,493 COP. Furthermore, his overall 2020 income when calculated per month is 14,107,500 COP, which is also higher than 1,145,555 COP and 6,732,493 COP.

67. The seventh and final criterion which the Officer stated Mr. Munoz did not meet in the denial is "[e]vidence of commercial successes in the performing arts, as shown by box office receipts or record, cassette, compact disk, or video sales."

68. Besides the boilerplate template language USCIS provides officers for requests for evidence, the Officer's only reasoning behind not granting Mr. Munoz this criterion was "[t]he petitioner only submitted one receipt for a play that was not created by him, the petitioner acted on the play. Also, this one receipt does not demonstrate commercial successes."

69. In the seventh criterion's section of the denial, the Officer also copied verbatim language from the Policy Memorandum (PM-602-0005.1) stating,

> [t]his criterion focuses on volume of sales and box office receipts as a measure of the petitioner's commercial success in the performing arts… the evidence must show that the volume of sales and box office receipts reflect the petitioner's commercial success relative to others involved in similar pursuits in the performing arts.

70. The Officer's reasoning stated in paragraph 68 is arbitrary, capricious, and an abuse of discretion because it is incorrect. Mr. Munoz did not only submit one receipt for a play in support of this criterion. Mr. Munoz submitted eight documents in support of this criterion including ratings published in major media publications.

71. Mr. Munoz explained in his RFE response that he satisfied this criterion because he performed as a leading actor in theater and television productions that amassed major commercial success. Specifically, Mr. Munoz provided evidence in support of his commercial success through four productions: *Me Enamoré*, *El Cartel de los Sapos: El Origen*, *La Viuda Negra I and II*, and *El Bronx*.

72. The record shows that Mr. Munoz achieved commercial success in the performing arts through his leading role as co-protagonist in *Me Enamoré*. The production sold out at the box office on several occasions as confirmed in the testimonial by *Me Enamoré*'s producer attesting to the sold-out box office. The testimonial also directly credits Mr. Munoz for the production's commercial success because he was one of the two protagonists.

73. Similarly, Mr. Munoz achieved commercial success in the performing arts through his leading role in highly-rated television productions *El Cartel de los Sapos: El Origen*, *La Viuda Negra I and II*, and *El Bronx*. In support of Mr. Munoz's commercial success through *El Cartel de los Sapos: El Origen*, he submitted publications by www.nacion.com, www.elnacional.com, and www.vanguardia.com, stating the

production ranked among the top ten most watched productions in Costa Rica on Netflix, the top ten most watched productions in Venezuela on Netflix, and the top ten most watched productions in Colombia on television, respectively. Next, in support of Mr. Munoz's commercial success through *La Viuda Negra* I and II Mr. Munoz submitted a publication by www.produ.com stating that *La Viuda Negra* I "captured an audience of more than 5.8 million viewers during the simultaneous premiere of the first season, placing Univision in second place at that time and surpassing ABC and CBS." Likewise, Mr. Munoz submitted another publication by www.produ.com ranking *La Viuda Negra* II at number eighteen among the top twenty US Hispanic productions on primetime from February 29 to March 6, 2016. Finally, in support of Mr. Munoz's commercial success through *El Bronx* Mr. Munoz submitted a publication by www.colombia.com stating the production's finale achieved the number one spot in ratings in Colombia. Mr. Munoz also submitted an article by www.pulzo.com stating *El Bronx* ranked number two in television ratings in Colombia the day it premiered.

74. By completely disregarding seven out of the eight evidentiary documents submitted in support of the seventh criterion with the RFE response, the Officer acted arbitrarily, capriciously, and abused their discretion.

## **INJURY**

75. Defendants' wrongful denials of the I-140 and MTR interfere with Mr. Munoz's ability to successfully conduct his business in the U.S. and potentially subject Mr. Munoz to substantial financial harm.

## **EAJA FEES**

76. In connection with the claim for attorneys' fees and costs, under the Equal Access to Justice Act, 28 U.S.C. § 2412, Plaintiff seeks to recover costs and attorneys' fees incurred in bringing this action. Parties who prevail against the federal government in APA actions like the present case may be entitled to an award of attorney's fees and other

expenses. The EAJA allows awards in cases where the government's position was not "substantially justified." To show that its position was substantially justified, the government has the burden of proving that its position had a reasonable basis in law and fact. Defendants must pay reasonable attorneys' fees and costs incurred in the prosecution of this cause.

## CLAIMS FOR RELIEF

1. Plaintiff hereby incorporates by reference as if set forth in full and at length herein paragraphs 1 through 74 of this Complaint.

2. The denial of the I-140 petition is an agency action under the Administrative Procedure Act ("APA").

3. The denial of the I-140 petition is improper and reviewable under 5 U.S.C. § 702.

4. As a result of these improper decisions by Defendants, Plaintiff is "suffering legal wrong because of agency action" and is "adversely affected or aggrieved by agency action," and therefore entitled to judicial review thereof" under 5 U.S.C. § 702.

5. The APA directs that the "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 17 706(2)(A).

6. Defendants' decision to deny Plaintiff's I-140 petition in light of a record providing substantial evidence of the Plaintiff's extraordinary ability as an actor is "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law" and should be "held unlawful and set aside" under 5 U.S.C. § 706(2)(A) 4 and (D).

7. Defendants' denial of Plaintiffs' I-140 petition violate the INA and the APA because, contrary to the INA and USCIS regulations, Defendants impermissibly determined that:

   a. The evidence submitted did not demonstrate that the published material was published in professional or major trade publications or other major media;

   b. The evidence did not indicate that the petitioner's work product was displayed at artistic exhibitions or showcases;

    c. The evidence did not indicate that the role the petitioner has performed for the organizations or establishments was leading or critical, or that the organizations or establishments have a distinguished reputation;

    d. The evidence did not show that the association requires outstanding achievements of its members;

    e. There is no evidence to establish that the petitioner actually participated in the judging of the work of others;

    f. The evidence did not establish that the petitioner's salary or remuneration is high relative to others working in the field; and

    g. The evidence does not establish that the petitioner has had commercial successes in the performing arts.

8. The decision denying the I-140 petition is not supported by substantial evidence.

9. Defendants failed to consider evidence presented to them, including several testimonials, employment contracts and major media publications.

10. Defendants' multiple mischaracterizations of the record, many of which were repeated in the RFE and denial; Defendants' complete disregard for evidence provided; and Defendants' reliance on an incorrect legal standard and nonexistent requirements; all indicate that Defendants failed to give adequate consideration to the matters before them, and that their decision is based on something other than the facts or the law.

11. Defendants' factual findings are clearly erroneous and not supported by the record, including, but not limited to, their findings that:

    a. The evidence submitted did not demonstrate that the published material was published in professional or major trade publications or other major media;

    b. The evidence did not indicate that the petitioner's work product was displayed at artistic exhibitions or showcases;

    c. The evidence did not indicate that the role the petitioner has performed for the organizations or establishments was leading or critical, or that the organizations or establishments have a distinguished reputation;

    d.   The evidence did not show that the association requires outstanding achievements of its members;

    e.   There is no evidence to establish that the petitioner actually participated in the judging of the work of others;

    f.   The evidence did not establish that the petitioner's salary or remuneration is high relative to others working in the field; and

    g.   The evidence does not establish that the petitioner has had commercial successes in the performing arts.

### RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests this Court enter judgment on his behalf and issue the following:

    A.   An order declaring that Defendants' denial of Plaintiff's I-140 petition is violative of the INA and its attendant regulations; violative of the Administrative Procedure Act; ultra vires; erroneous as a matter of law and fact; arbitrary and capricious, an abuse of discretion and not otherwise in accordance with law; and violative of due process;

    B.   An order directing Defendants and their agents to issue immediately all necessary and appropriate documents to Plaintiff to evidence the approval of his I-140 petition.

    C.   An order directing Defendants and their agents to withdraw the denial of, and to approve Plaintiff's I-140 petition;

    D.   An order awarding Plaintiff his attorneys' fees and costs; and

    E.   An order granting such other relief as the Court may deem just, equitable and proper.

Dated: December 20, 2022

Respectfully submitted,
/s/ Laura Arboleda
Laura Samantha Arboleda, Esq.
Attorney Bar Number 1039614
Laura@authenticlawfirm.com
Authentic Law Firm PLLC
6724 NW 189th Ter
Miami Lakes, FL 33015
Telephone: (305)298-8181
Facsimile: (305)675-0561
Attorney for Plaintiff
WILLIAM JULIAN MUÑOZ FARIETA